UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No. 4:14-859-BHH |
| ) | |
| v. ) | **ORDER DENYING** |
| ) | **COMPASSIONATE RELEASE** |
| DAVID LAWRENCE WALLACE, JR. ) | |
| ) | |

Defendant David Lawrence Wallace, Jr. ("Wallace") has filed a motion to reduce sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) (ECF No. 77) and a related motion to appoint counsel (ECF No. 81). He contends that he is at heightened risk for serious injury or death from the novel coronavirus, COVID-19, due to his hypertension. (*See* ECF No. 77 at 13.) He requests a reduction in sentence to time served. (*See id.* at 18.) For the reasons set forth below, Wallace's motion is denied.

## BACKGROUND

On December 16, 2014, a federal grand jury indicted Wallace in a single-count indictment, charging him with solicitation to commit Hobbs Act Robbery in violation of 18 U.S.C. §§ 373 and 1951. (ECF No. 20.) Wallace entered a guilty plea on August 18, 2015. (ECF Nos. 60 & 61.)

The United States Probation Office prepared a presentence investigation report ("PSR"), which outlined the offense conduct, Wallace's criminal history, and the applicable guideline imprisonment range. (PSR, ECF No. 76.) According to the PSR, Wallace's conduct involved the intricate planning of and solicitation of another individual to participate in the robbery of an armored car facility in Myrtle Beach, South Carolina. (PSR ¶¶ 5–37.) The individual who Wallace solicited for the robbery reported Wallace's plan to the FBI and became a confidential informant ("CI"). (PSR ¶ 5.) Wallace, a member of the

1

U.S. Army Reserves at the time he committed the offense, was a former employee of the armored car company and was familiar with the company's procedures. (PSR ¶¶ 5, 70.) Wallace solicited the CI, a fellow Army reservist, during drill duty in Wilmington, North Carolina. (PSR ¶ 6.) Wallace planned to enter the home of the facility manager, obtain facility security codes, and kill the manager and his wife. (PSR ¶ 11.) Wallace also planned to drive the manager's pickup truck to the facility, take additional codes from the facility guards so they would have three alarm codes for the alarm box, and return the truck to the manager's house at the end of the heist. (*Id.*) Wallace further planned to burn the money wrappers and destroy any bags that contained consecutive bills. (PSR ¶ 12.)

Wallace stated he wanted to conduct the robbery for a long time and had given it a lot of thought but was unable to find someone else with enough courage to be involved. (PSR ¶ 13.) Wallace gave the CI a map and drawing to familiarize the CI with the robbery plan. (PSR ¶ 16.) The map revealed security camera angles, entrance points, and the location of rooms at the facility containing the money to be stolen. (*Id.*) Wallace also planned an alibi witness and planned to go to his father-in-law's property to fire off rounds of ammunition in case law enforcement conducted a gunshot residue test on him. (PSR ¶ 18.)

Wallace rode with the CI to the manager's residence to perform a "dry run" of the plan and calculate the driving time from the manager's house to the facility. (PSR ¶¶ 19–20.) During the drive, Wallace discussed the possibility of beheading the manager and his wife to make the crime appear as an act of domestic terrorism (he described ISIS beheadings and discussed using the same tactic). (PSR ¶ 20.) Wallace also mentioned using improvised explosive devices as a distraction to responding law enforcement. (*Id.*)

Wallace and the CI drove to the armored car facility so Wallace could count the number of trucks and observe who entered and exited the facility. (PSR ¶ 24.) In further discussions with the CI, Wallace indicated they may have to shoot the facility guards in the head or back and stated the guards do not usually wear vests. (PSR ¶ 33.) When describing various proposed methods of killing the manager, Wallace stated his conscience does not work like everyone else's conscience, and that he would have no remorse for killing the manager, the manager's wife, or anyone else killed in the robbery. (PSR ¶ 34.) In an effort to thwart any additional plans to commit the robbery and murder or to recruit additional participants, the FBI arrested Defendant on November 17, 2014. (PSR ¶ 37.) The manager and his wife submitted victim impact statements, which were attached to the PSR. (ECF Nos. 76-3 & 76-4.)

The PSR also outlined Wallace's criminal history and guideline imprisonment range. Although Wallace had two prior arrests, he had no prior criminal convictions, which resulted in a criminal history score of zero and a criminal history category of I. (PSR ¶¶ 46–48.) Wallace received a seven-level increase pursuant to United States Sentencing Guidelines (USSG) §2B3.1(b)(2)(A) for his intent to discharge a firearm during the course of the robbery, a four-level increase pursuant to USSG §2B3.1(b)(3)(C) for his intent to inflict permanent or life-threatening bodily injury to others during the robbery, and a seven-level increase pursuant to USSG §2B3.1(b)(7)(H) for the potential intended loss of over 30 million dollars. (PSR ¶ 53.) However, because Defendant discussed his intent to kill others during the robbery, the U.S. Probation Office applied a cross reference for first degree murder pursuant to USSG §2A1.1. (*Id.*) Thus, Wallace's guideline imprisonment range was driven by the murder cross reference, which resulted in a base offense level

3

of 43. (*Id.*) After application of a three-level decrease for solicitation and a three-level decrease for acceptance of responsibility, Wallace's total offense level was 37. (PSR ¶¶ 54, 60–62.)

Wallace's guideline imprisonment range was 210 to 262 months. (PSR ¶ 91.) However, because the statutory maximum for the offense was ten years, Wallace's guidelines range became 120 months. (*Id.*) The Court sentenced Wallace to 120 months of imprisonment on April 13, 2016. ECF Nos. 72-73.

Wallace has served nearly six years of his ten-year sentence. He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the Bureau of Prisons ("BOP"), relying on the threat posed by the COVID-19 pandemic. On June 1, 2020, Wallace filed his *pro se* motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (ECF No. 77.) The Government responded in opposition to the motion on June 24, 2020. (ECF No. 80.) On July 6, 2020, Wallace filed a motion to appoint counsel to assist him with his request for compassionate release. (ECF No. 81.) These matters are ripe for review and the Court now issues the following ruling.

## STANDARD OF REVIEW

Absent certain exceptions, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Section 3582(c)(1)(A) sets forth an exception to this general rule where a defendant qualifies for a modification in his sentence due to certain age, health, or family circumstance factors, often referred to as compassionate release. *United States v. Norris*, 2020 WL 2110640, at *1 (E.D.N.C. Apr. 30, 2020). Prior to the passage of the Formerly Incarcerated Reenter Society Transformed Safely

Transitioning Every Person Act, Pub. L. No. 115- 391, 132 Stat. 5194 (2018) ("First Step Act"), the BOP maintained exclusive discretion to file a motion for compassionate release pursuant to § 3582(c)(1)(A). *United States v. Dowdell*, 669 F. App'x 662 (4th Cir. 2016). Section 603 of the First Step Act amended § 3582(c)(1)(A) to divest exclusive control of this process from the BOP and empowered inmates to request compassionate release from the sentencing court after exhausting their administrative remedies. *United States v. Griggs*, 2020 WL 2614867, at *3 (D.S.C. May 22, 2020) (quoting *United States v. Edwards*, 2020 WL 1650406, at *3 (W.D. Va. April 2, 2020)).

As amended by the First Step Act, the compassionate release statute now provides in pertinent part:

> (c) Modification of an imposed term of imprisonment. —The Court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i). "A defendant who seeks compassionate release under § 3582(c)(1)(A)(i) has the burden of establishing that such relief is warranted." *Griggs*, 2020 WL 2614867 at *3.

The commentary and application notes to §1B1.13 of the United States Sentencing Commission's advisory Guidelines Manual provide criteria for determining whether extraordinary and compelling reasons that warrant a sentence reduction are present ("the Policy Statement"). USSG §1B1.13, comment. (n.1). These criteria generally concern the age, medical condition, or family circumstances of the defendant. *Id.* The Policy Statement provides four examples of what constitute "extraordinary and compelling reasons" for a sentence reduction: (1) medical condition of the defendant; (2) age of the defendant; (3) family circumstances; and (4) a catch-all "other reasons." *Id.* Importantly, the Policy Statement only applies to motions filed by the Director of the BOP. *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019). "The Sentencing Commission has not amended or updated the old policy statement since the First Step Act was enacted, nor has it adopted a new policy statement applicable to motions filed by defendants." *Id.* (internal citation and footnote omitted). Accordingly, "[w]hile the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentencing reduction under § 3582(c)(1)(A)(i)." *Id.*

"Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement." *Id.* at 579–80. Therefore, the determination of whether extraordinary and compelling reasons exist in a particular case is a question reserved to the sound discretion of the district court. *See id.* In addition to considering whether extraordinary and compelling circumstances are present, in order to determine if a reduction in sentence is warranted, a court must further

6

consider the 18 U.S.C. § 3553(a) factors and decide whether the defendant is a danger to the safety of another person or the community as provided in 18 U.S.C. § 3142(g). USSG §1B1.13.

## DISCUSSION

### A. Administrative Exhaustion Requirement

Wallace submitted an administrative request for a sentence reduction to the BOP on April 18, 2020, which request was subsequently denied by the warden of his facility on April 24, 2020. (*See* ECF No. 80 at 7.) Wallace filed the instant motion for sentence reduction on June 1, 2020, more than 30 days from the date he submitted his administrative request to the BOP. (*Id.*) In its response to Wallace's motion, the Government concedes that Wallace has satisfied the administrative exhaustion requirement of § 3582(c)(1)(A); and asserts that the Court has jurisdiction to consider the merits of Wallace's motion. (*Id.*) The Court agrees and will proceed to analysis of the merits.

### B. Extraordinary and Compelling Reasons

The COVID-19 pandemic presents a public health crisis in this country, and indeed the world, of a scope that is unprecedented in our lifetime. As of August 12, 2020, the COVID-19 virus has infected more than 5.1 million Americans and resulted in more than 164,000 American deaths. *See COVID-19 Dashboard by the Center for Systems Science and Engineering*, JOHNS HOPKINS UNIVERSITY, https://coronavirus.jhu.edu/map.html (last accessed August 12, 2020). There is currently no vaccine that has been proven safe or treatment that has been proven effective. According to guidance from the Centers for Disease Control and Prevention ("CDC") the best way to prevent illness is to avoid being

7

exposed to the virus, which is thought to spread mainly from person to person by way of respiratory droplets produced when an infected person coughs, sneezes, or talks. *See Protect Yourself*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last updated July 31, 2020). The recommended methods to slow the spread of the virus are to avoid close contact (defined as being within 6 feet of another) with people outside your household—known as "social distancing," to wash your hands often, to cover your mouth and nose with a mask when around others, and to clean and disinfect surfaces. *See id.* It goes without saying that these precautions are often difficult, if not impossible, for prisoners to maintain given that they have little control over their isolation from others and are not readily able to secure products to protect themselves, such as masks and hand sanitizers. Thus, courts all over the country have acknowledged that correctional facilities are vulnerable to viral outbreaks. *See, e.g.*, *Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19.").

As the Government notes in its brief, the BOP has implemented substantial measures to protect prisoners from COVID-19 and to treat those who are infected. (*See* ECF No. 80 at 4–5.) These efforts are admirable, and the BOP is to be commended for its professionalism. Nevertheless, the virus continues to proliferate in federal correctional institutes. As of August 12, 2020, the BOP reports that there are currently 1,293 federal inmates and 586 BOP staff with confirmed positive test results for COVID-19. *See COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last updated August 11, 2020). The BOP further reports that 9,667 inmates and 768 staff have

8

recovered, but 111 inmates and 1 BOP staff member have died from the virus. *Id.* As of the issuance of this Order, the current number of confirmed active cases of COVID-19 at FCI Elkton, where Wallace is housed, stands at 8 inmates and 2 staff. *See COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last updated August 11, 2020).

The Government argues that the mere existence of COVID-19, which poses a general threat to every non-immune person in the country, on its own does not justify compassionate release in any particular case (*see* ECF No. 80 at 12), and the Court agrees. *See United States v. Kess*, No. CR ELH-14-480, 2020 WL 3268093, at *6 (D. Md. June 17, 2020) ("To be sure, the coronavirus is not tantamount to a 'get out of jail free' card." (citation and quotation marks omitted)). The Government contends that Wallace's motion should be denied because he has not shown that he suffers from a medical condition that falls within one of the categories specified in the Policy Statement as constituting an extraordinary and compelling reason warranting a sentence reduction. (*See* ECF No. 80 at 13–14.)

Application Note 1 of USSG §1B1.13 defines "extraordinary and compelling reasons" in part as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

> (ii) The defendant is—
>
> > *(I) suffering from a serious physical or medical condition,*
> >
> > (I) suffering from a serious functional or cognitive impairment, or
> >
> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that *substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility* and from which he or she is not expected to recover.

USSG §1B1.13 comment. (n.1) (emphasis added). As mentioned above, this Policy Statement provides helpful guidance to the Court without constraining its independent analysis of whether extraordinary and compelling reasons warrant a sentence reduction under the specific circumstances of this case. *Beck*, 425 F. Supp. 3d at 579.

The CDC maintains a list of underlying medical conditions that place people of any age at an increased risk for severe illness from COVID-19, dividing the conditions into two categories: (1) conditions for which individuals "are at an increased risk of severe illness from COVID-19" ("first category"), and (2) conditions for which individuals "might be at an increased risk for severe illness from COVID-19" ("second category"). *People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated July 30, 2020). "Hypertension or high blood pressure" is designated in the second category. *Id.*

The Court is advised that the Department of Justice has taken the position that an inmate having one of the medical conditions identified by the CDC as placing an individual at increased risk for serious injury or death from COVID-19 constitutes an "extraordinary and compelling reason" under USSG §1B1.13 comment. (n.1(A)(ii)(I)). *See United States*

10

*v. Moon*, No. CR 0:17-01151-MGL-1, 2020 WL 3958266, at *2 (D.S.C. July 13, 2020) ("The Court concurs with the Department of Justice's position [that] an inmate 'with a medical condition that the Center for Disease Control (CDC) has identified as a risk factor for COVID-19, and from which the inmate is not expected to recover,' qualifies under the definition for extraordinary and compelling circumstances during this pandemic." (modifications omitted)); *United States v. Fischer*, No. CR ELH-14-0595, 2020 WL 2769986, at *5 (D. Md. May 27, 2020) ("Notably, the Department of Justice has recognized the unique risks posed to inmates and employees. It recently adopted the position that any inmate who suffers from the chronic conditions associated with severe illness from COVID-19 should be considered as having an 'extraordinary and compelling reason' warranting reduction."). In other words, at least with respect to underlying conditions in the first category, an inmate is deemed to be "suffering from a serious . . . medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *See* USSG §1B1.13 comment. (n.1(A)(ii)(I)). It is unclear whether underlying conditions in the second category, including "Hypertension or high blood pressure," standing alone, should be considered to be of a severity as to constitute extraordinary and compelling circumstances pursuant to the Department of Justice's position, given that the CDC's guidance states that individuals with those conditions "might" be at an increased risk. In any event, in the instant case the Court finds that Wallace has not made an adequate showing that he possesses a medical condition that falls within the Policy Statement. He has not submitted any documentation of his hypertension or even indicated whether it rises to a level requiring treatment, for example,

11

by taking high blood pressure medication. Therefore, the Court concludes that Wallace has not demonstrated the presence of extraordinary and compelling reasons warranting consideration for a sentence reduction in the context of the COVID-19 pandemic.

**C. Section 3553(a) Factors and Danger to Public Safety**

Even if the Court were to find that extraordinary and compelling reasons were present, the Court would still deny a sentence reduction in this case. The combination of an inmate's potential exposure to COVID-19 and possession of one or more of the CDC's itemized list of preexisting conditions does not automatically provide a basis for a reduced sentence. *Griggs*, 2020 WL 2614867 at *7. The Court must also consider the factors in 18 U.S.C. § 3553(a) and determine whether the defendant is a danger to the safety of another person or the community as provided in 18 U.S.C. § 3142(g). USSG §1B1.13.

The § 3553(a) factors instruct the Court to "impose a sentence sufficient, but not greater than necessary" by considering, in part:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .;
>
> . . . .
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . .

18 U.S.C. § 3553(a). Before granting a defendant's release, § 3142(g) instructs the Court to set "conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community" by taking into account:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> . . . .
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release.

18 U.S.C. § 3142(g).

Neither the § 3553(a) factors, nor the principles set forth in § 3142(g) support a sentence reduction in this case. The Court cannot conclude that Wallace would not pose a danger to public safety if released. Wallace's planning of the intended robbery and intended killing of the facility manager and his wife are truly startling. His plan was no juvenile fantasy. Rather, he solicited a fellow military reservist to participate in the intended crime, meticulously thought through a false alibi and a way to excuse the presence of gunshot residue on his hands, planned to steal firearms belonging to his brother-in-law and the facility manager's truck to commit the crime, proposed hyperviolent methods of killing the facility manager in order to stage the crime as an act of domestic terrorism, and conducted a "dry run" of the crime in order to calculate driving times and observe traffic coming and going from the armored truck facility. In addition, Wallace explained that he would have no remorse for killing the facility manager, his wife, or any guards that got in the way of the robbery because his conscience does not work like everyone else's conscience. Even accounting for the unique concerns posed by the

COVID-19 pandemic, any sentence less than 120 months would be insufficient to reflect the seriousness of Wallace's offense, provide just punishment, and protect the public from further crimes by Wallace.

## CONCLUSION

For the foregoing reasons, Wallace's motion for compassionate release (ECF No. 77) is DENIED. His related motion to appoint counsel (ECF No. 81) is also DENIED.

**IT IS SO ORDERED.**

                                             /s/Bruce Howe Hendricks
                                             United States District Judge

August 12, 2020
Charleston, South Carolina